IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| BRENDAN E. ADAMS, an individual, | CV 18–148–M–DLC |
| Plaintiff and Counter Defendant, | |
| vs. | ORDER |
| HOWARD C. ROBERTS, an individual, | |
| Defendant and Counter Claimant. | |

Before the Court is Defendant Howard C. Roberts' Motion for Sanctions for Witness Intimidation.  (Doc. 43.)  Roberts accuses Plaintiff Brendan E. Adams of making a "flagrant attempt to tamper with and intimidate one of Roberts' key witnesses," John Kenney.  (*Id.*)  He asks the Court to enter judgment against Adams as a sanction.  (*Id.*)  With trial less than a month away, the Court ordered expedited briefing and set a hearing for April 16, 2021.  (Doc. 49.)

After considering the parties' filed briefs and exhibits, the testimony provided by six witnesses at the hearing, and the parties' oral arguments, the Court denies the motion, and this matter remains set for trial on May 3, 2021.  To that end, the Court further takes the opportunity in this Order to resolve two evidentiary issues that arose at the hearing.

## BACKGROUND[1]

This case centers around a 2017 altercation between Adams and Roberts that allegedly left Adams with long-term injuries that, at least until 2019, prevented him from engaging in various physical activities—including driving long distances and recreating generally—without significant pain and discomfort. (*See, e.g.*, Docs. 1 at 4; 44-2 at 2.)  To contradict Adams' claims regarding the extent of his injuries, Roberts plans to proffer a video showing Adams swing-dancing with his wife in September 2018, about a year after the fight. (Doc. 44 at 2.)  John Kenney, who Roberts will presumably call as a witness at the upcoming trial,[2] took the video on his cell phone.  (*Id.*)  At issue in the instant motion is a recent altercation between Adams and Kenney.

On March 17, 2021, Adams and Kenney ran into each other outside a bar in Lakeside, Montana.  Adams says he approached Kenney after Kenney flipped him off.  Kenney denies initiating the interaction, and instead says that Adams engaged with him about his moving plans, as Kenney apparently plans to move out of the Lake Mary Ronan area soon.  Whatever the case may be, the conversation quickly became heated.  Adams informed Kenney that the sooner he moved, the better, because he had "pissed off" plenty of people in the community.  Adams then

---

[1] Along with the pleadings and pre-hearing briefing, the Court derives the relevant background facts from witness testimony at the April 16, 2021 hearing.
[2] Roberts lists John Kenney on his "may" call witness list.  (Doc. 27.)

referenced the "train station," an allusion to the execution site in *Yellowstone*, a television show about the modern and violent American West.  Specifically, Adams testified that he warned Kenney that if he pissed off enough people, "somebody" might take him to the train station.

Kenney testified that Adams went on to accuse him of taking "photos and pictures of everyone," to which Kenney responded that he indeed had taken a video of Adams and his wife dancing.  Kenney said that the temperature of the interaction continued to rise, with Adams shouting accusations of pedophilia and maintaining photos of "little girls" at Kenney.  After making a homophobic remark, Adams invited Kenney over to his house to fight and chest-bumped him. The interaction ended when the owner of the bar and Les Walter came outside to break them up.

Kenney testified to his belief that Adams confronted him to prevent him from testifying at the upcoming trial in this case.  He admitted, however, that when the Lake County Sheriff contacted him about the incident several days later, he said he did not take Adams' threats seriously.  Les and Rhonda Walter, members of Kenney's Saint Patrick's Day bar-hopping party, testified that they witnessed the altercation from inside the bar.  Because Rhonda stayed inside, she did not hear anything that Adams said to Kenney outside.  When he went outside to stop the

fight, Les testified that he heard Adams making comments about pedophilia and little girls.

Adams testified that he never threatened Kenney. He further testified that until Kenney told him on March 17, 2021, he did not know that Kenney took the swing-dancing video. He went on to say that he did not even know that Kenney was a witness in this case. In rebuttal, Roberts testified that during a break in Adams' 2019 deposition, he told Adams that Kenney took the video.

## DISCUSSION

Roberts argues that Adams' conduct on March 17, 2021 amounts to a violation of federal anti-witness tampering law. Specifically, 18 U.S.C. § 1512(b) proscribes anyone from knowingly using intimidation and threats "to prevent the testimony of any person in an official proceeding." Importantly, the conduct prohibited by § 1512(b) requires "a finding of intent to cause a witness to withhold testimony." *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 602 (9th Cir. 1991). If a court finds that a party's actions amount to the conduct contemplated by § 1512(b), it may impose sanctions pursuant to its inherent authority to manage judicial proceedings. *See id.*; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 57 (1991) ("[A] party may be sanctioned for abuses of process occurring beyond the courtroom[.]").

Roberts provides no argument regarding the burden of proof he must carry to establish that Adams engaged in sanctionable witness-tampering, and the Court's research is similarly unilluminating, at least as it relates to the Ninth Circuit's view.  *See Torres v. Wells Fargo Bank*, CV 17-9305-DMG (RAOx), 2019 WL 8012686, at *3 (C.D. Cal. Dec. 17, 2019) ("[T]he Ninth Circuit does not appear to have expressly considered whether and how to sanction a civil litigant when that litigant has tampered with a witness[.]").  However, he cites *Ramirez*, which supplies persuasive authority on this point.  *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772 (7th Cir. 2016).  In *Ramirez*, the court affirmed dismissal with prejudice as the appropriate sanction for the plaintiff offering a witness money in exchange for favorable testimony.  *Id.* at 774.  In doing so, the court rejected the plaintiff's contention that a clear and convincing standard should apply, and instead "ma[de] clear that a preponderance of the evidence is sufficient."  *Id.* at 777.  Thus, and out of an abundance of caution favorable to Roberts, the Court applies a preponderance of the evidence standard to the instant motion.

*Ramirez* is helpful, too, in analyzing the merits of Roberts' charge.  Whether a court sanctions witness tampering pursuant to the Federal Rules of Civil Procedure, *e.g.,* Rule 37, or its inherent authority to sanction misconduct, *Ramirez* instructs that it must "find that the responsible party acted or failed to act with a degree of culpability that exceeds simple inadvertence or mistake before it may

choose dismissal as a sanction[.]" *Id.* at 776.  Relevant here, "[a]ny sanctions imposed pursuant to the court's inherent authority must be premised on a finding that the culpable party willfully abused the judicial process or otherwise conducted the litigation in bad faith." *Id.* (citing, *inter alia*, *Chambers*, 501 U.S. at 46–50).

The evidence presented in *Ramirez* established the requisite degree of culpability to support the district court's finding that the plaintiff engaged in witness tampering. *Id.* at 781–82.  A witness testified that the plaintiff offered him money, he accepted it, and the two discussed what his favorable—and false— testimony would be. *Id.* at 781.  The court was careful to note that "no other witness (including Ramirez, who chose not to testify) disputed this account." *Id.* Giving this uncontroverted testimony credit, the court agreed that the defendant had met its burden to show that "Ramirez [the plaintiff] made a calculated effort to bolster his floundering case by offering payment to a witness to support his allegations[.]" *Id.* at 782.

Similarly, the "undisputed evidence" of a plaintiff's threatening text messages to a witness led the district court in *Torres* to dismiss his claims with prejudice.  2019 WL 8012686, at *3.  Specifically, the plaintiff suggested that "he would take steps to have [the witness] fired from his job or 'take out' [the witness]" by making statements to a special investigator. *Id.*  While the plaintiff argued, *inter alia*, that his conduct did not actually threaten the witness, the court

concluded that his "messages cannot be explained away as anything other than threats of retaliation against a witness due to what [the plaintiff] perceived to be unfavorable testimony." *Id.* at *4.

Here, in contrast to the uncontroverted evidence presented in *Ramirez* and *Torres*, the testimony presented at the hearing left the issue of Adams' intent on March 17, 2021 in genuine dispute. *See Rent-A-Center, Inc.*, 944 F.2d at 602. True, the parties agree that Adams referenced the "train station," which both he and Kenney understood to be an allusion to the killing grounds in *Yellowstone*. But Adams explains he only meant to convey to Kenney that his activities in the community—particularly involving a waitress at a local eatery—might cause "someone" to eventually kill him, but his comment was not intended to influence Kenney to withhold testimony in this case.

Indeed, Adams testified that he did not know Kenney was involved as a witness in this matter, let alone that Kenney was the source of the swing-dancing video. While Roberts testified that he informed Adams about Kenney's involvement during a break in a 2019 deposition, the Court finds his version of events convenient at best and not credible at worst. The Court cannot imagine a situation in which counsel for Roberts or Adams would leave them unattended considering their volatile history. For that matter, Roberts admitted that Adams was taken to a separate room during breaks in the deposition.

For his part, Kenney testified that the "train station" comment came before he told Adams that he took the video.  And, even after Kenney revealed his involvement in the case, Adams spent the remainder of the interaction haranguing him with accusations of pedophilia and homophobic slurs.  Indeed, Adams' ire as it related to Kenney's photos and videos appeared wholly directed at whether Kenney had pictures of "little girls" on his phone, not the video at issue in this case.

On these facts, and while the Court does not doubt that Kenney felt threatened and harassed by an admittedly inebriated Adams on March 17, 2021, the Court cannot find that Roberts carried his burden to prove that Adams intended his conduct to cause Kenney to withhold testimony.  Instead, the uncontradicted evidence demonstrates only that Adams and Kenney are neighbors between whom bad blood runs, and that they each felt antagonized by the other at a bar on Saint Patrick's Day.  However, what their fight was actually about remains genuinely in dispute.  Whether it was about Adams' perception of Kenney's conduct with other people in their small community, or whether it was about Kenney's involvement in this case is unclear.  With that said, though, Adams' claim that he knew nothing about Kenney's role in this case is controverted only by testimony that lacks credibility.

In sum, the Court does not find that Roberts proved by a preponderance of the evidence that Adams intended for Kenney to withhold testimony when he fought with him last month.  While the Court has the inherent power to sanction abuses of the judicial process, it has no jurisdiction to punish a litigant for bad behavior wholly unrelated to the case before it.  Roberts has not convinced the Court that what occurred on March 17, 2021 was anything other than a Saint Patrick's Day bar dispute.  Roberts' motion will be denied, and this case will proceed to trial.

With trial ahead and having heard significant sworn testimony during the April 16, 2021 hearing, the Court is compelled to briefly address two evidentiary issues here.  First, this Order raises a question regarding the scope of Kenney's trial testimony as it relates to the March 17, 2021 incident.  The event bears only marginal relevance to the issues to be tried and carries with it a significant potential for unfair prejudice, confusion, and wasting time.  *See* Fed. R. Evid. 403. Thus, the Court will allow only narrow inquiry into the incident.  Specifically, Kenney may testify *solely*: (1) to the video he took of Adams swing-dancing; (2) the fact of the Saint Patrick's Day altercation; (3) to the fact that he felt threatened and intimidated by Adams, and (4) to his belief that the altercation stemmed from his involvement in this case.

Roberts is warned that any effort to use the Saint Patrick's Day incident to circumvent the bar against character evidence will be rejected.  *See* Fed. R. Evid. 404(a)(1).  As Roberts knows, "[e]vidence of any other . . . act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Of course, other act evidence may be admissible for another purpose.  Fed. R. Evid 404(b)(2).  Indeed, at the hearing, Roberts telegraphed that he would likely proffer evidence of the Kenney altercation to prove pattern or identity, not character.  However, the Saint Patrick's Day incident bears no similarities to the fight at the center of this case, apart from involving Adams and an altercation.  In other words, nothing about the fight at the bar last month is sufficiently "peculiar, unique or bizarre . . . nor [is] it so unusual or distinctive as to constitute [Adams'] personal 'signature[.]'"  *See United States v. Ezzell*, 644 F.2d 1304, 1306 (9th Cir. 1981) (Rule 404(b) incorrectly invoked where points of similarity between bank robberies were ones so common to most bank robberies as to be "entirely unhelpful").  Thus, and again, the Court closely crops the evidence Kenney may provide about the Saint Patrick's Day incident, as any more expansive inquiry is both unhelpful and unfairly prejudicial character evidence.

With that said, though, the Court finds that the Bolitho incident and the Lackey incident *are* sufficiently "peculiar, unique or bizarre" as to properly invoke

- 10 -

Rule 404(b)—with some parameters.  Like the instant case, the Bolitho and Lackey incidents involved altercations between Adams and others over disputed property rights that escalated to involving law enforcement.  In all three incidents, Adams allegedly protected his position by way of verbal and physical aggression.  Unlike a Saint Patrick's Day bar fight, the points of similarity between these alleged acts indicates a "peculiar" pattern wherein Adams finds himself resolving disputes over property lines and land access through aggressive confrontations with his neighbors.  This pattern is relevant and helpful to deciding an issue central to this case: the identity of the aggressor in the altercation between Adams and Roberts. (*See* Docs. 2 at 5–6; 4 at 6–7.)  Thus, the Court is inclined to admit evidence of the Bolitho and Lackey incidents, not to prove Adams' character, but to prove a unique pattern that is helpful in proving identity.  *See* Rule 404(b)(2) (other act evidence admissible to prove identity).[3]

Still, while Roberts may invoke Rule 404(b)(2) as it relates to the Lackey and Bolitho incidents, Rule 403 balancing remains an "integral step toward a determination of admissibility[.]"  *King v. Ahrens*, 16 F.2d 265, 269 (8th Cir. 1994).  The danger is substantial that inquiry into the Bolitho and Lackey affairs

---

[3] In addition to their similarity to the event at issue in this case and that they provide proof of a material point in issue, the Bolitho and Lackey incidents occurred relatively recently, and Adams does not dispute the fact that either altercation occurred.  *See United States v. Beckman*, 298 F.3d 788, 794 (9th Cir. 2002) (setting out the test for Rule 404(b)(2) admissibility).

will unfairly prejudice Adams, waste time, and confuse the issues.  Fed. R. Evid. 403.  Thus, like the scope of Kenney's testimony about the Saint Patrick's Day incident, the Court will grant Roberts only marginal latitude to proffer evidence of the Lackey and Bolitho matters.

In particular, the Court warns Roberts that witnesses must have personal knowledge of the Lackey and Bolitho events to testify about them.[4] Notwithstanding Rule 404(a)'s prohibition against character evidence in civil cases, Roberts elicited testimony at the hearing that can only be considered evidence of Adams' character founded in small-town gossip and rumors about these two events, proof which was laden with hearsay and double-hearsay.  Any efforts to do the same at trial will be summarily rejected.  Further, the Court is wholly disinterested in litigating the Bolitho and Lackey affairs.  Roberts' inquiry will be limited to establishing the points of "peculiar" similarity between these events and the event at issue.  Attempts to detour into historical background of these altercations will be denied.

At bottom, the Court reminds the parties that this is a simple case about an altercation between neighbors.  Roberts and Adams are cautioned not to unnecessarily muddy the waters by making this case about anything other than the fight in 2017 that formed the basis of the Complaint.

---

[4] Neither the Lackeys nor the Bolithos are listed on Roberts' "will" or "may" call witness lists.

**ORDER**

For foregoing reasons, IT IS ORDERED that Roberts' motion for sanctions

(Doc. 43) is DENIED.

DATED this 19th day of April, 2021.

_____
Dana L. Christensen, District Judge
United States District Court

- 13 -