IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| BRENDAN E. ADAMS, an individual, | CV 18–148–M–DLC |
| Plaintiff and Counter Defendant, | |
| vs. | ORDER |
| HOWARD C. ROBERTS, an individual, | |
| Defendant and Counter Claimant. | |

Following an altercation on a dirt road in northwestern Montana, Plaintiff and Counter Defendant Brendan E. Adams sued Defendant and Counter Claimant Howard C. Roberts alleging battery, trespass, and intentional infliction of emotional distress. Roberts, in turn, asserted counterclaims against Adams for assault and false imprisonment. The case went to trial, and the jury returned a verdict in favor of Roberts on the false imprisonment claim, awarding him both compensatory and punitive damages. On the remaining claims and counterclaims, the jury determined neither party succeeded.

Now before the Court is Adams' Motion for Relief Under Rules 50 & 59, and to Extend Automatic Stay. (Doc. 105.) Adams joins his motion for judgment as a matter of law, under Federal Rule of Civil Procedure 50, with his alternative motion for remittitur or a new trial, pursuant to Federal Rule of Civil Procedure 59.

*See Smith v. City and Cnty. of Honolulu*, 887 F.3d 944, 949 (9th Cir. 2018).  He

adds that the Court could also amend its judgment, under Rule 59(e), and to the

extent applicable, Rule 52(b).

For the following reasons, the Court denies Adams' request for post-trial

relief.

**BACKGROUND**[1]

On July 12, 2017, Roberts crossed Adams' property on Lake Mary Ronan

via an easement road (the "Easement") to reach land owned by Lance Melton on

the Easement's south end.  Roberts was looking for his daughter, Lindsay, who had

called him in distress following a heated interaction she had with Adams and his

family stemming from her own use of the Easement.  When Roberts reached the

Melton property and exited his truck, he turned to see Adams approaching him on

a four-wheeler.

At trial, the parties disputed what happened next.  Adams testified that

Roberts grabbed him by the throat and threw him to the ground.  Roberts countered

that any physical contact he made with Adams was to prevent Adams from using

the four-wheeler to pin him against his truck.   In any event, Adams eventually

drove his four-wheeler back to the north end of the Easement, where the Easement

---

[1] The Court derives the facts contained in this section from the evidence presented to the jury at
trial.

meets the public road.  Once there, Adams parked the four-wheeler such that it blocked anyone from exiting the Easement.

As such, when Roberts drove his truck back across the Easement toward the north end, he found his return to the public road blocked.  Roberts dialed 911, informed authorities that Adams prevented him from leaving, and returned to Lance Melton's property at the south end of the Easement pursuant to the dispatcher's instructions.  Once Roberts parked, someone—Adams or one of Adams' family members—moved the four-wheeler from where it sat blocking the north end of the Easement to the block the Easement's south end, where it accessed Lance Melton's property.

The evidence showed Adams then sat in a lawn chair in the middle of the Easement.  Though Adams testified that the alleged "beating" he took from Roberts left him dazed, a photograph revealed that Adams sat comfortably with his legs crossed while he talked on his cellphone and reviewed documents contained in a file folder.  Meanwhile, Adams' sister sat in another lawn chair on the Easement, this one positioned in front of the four-wheeler, facing Roberts where he stood waiting for authorities on the Melton property.  Adams' wife and son stood nearby, shouting back and forth with Roberts.  Eventually, law enforcement arrived at the scene and the parties dispersed.

Adams filed suit in this Court, invoking diversity jurisdiction pursuant to 28 U.S.C. § 1332(a); at the time the action commenced Adams was a citizen of Oregon and Roberts was a citizen of Montana, and Adams alleged that the amount in controversy exceeded $75,000.[2]  (Doc. 1 at 1–2.)  As outlined already, Adams asserted three intentional tort claims against Roberts: battery,[3] trespass, and intentional infliction of emotional distress.  Roberts counterclaimed, alleging two intentional tort claims of his own—assault and false imprisonment or unlawful restraint—and seeking more than $100,000 in damages.  (Doc. 4 at 7–8.) Additionally, Roberts contended that any force he used against Adams was justified to protect himself.  (Docs. 4 at 4; 64 at 4–5.)  Neither party moved for summary judgment, and the case proceeded to trial on all claims and counterclaims.

After a five-day trial, the jury returned a verdict in favor of Roberts on his false imprisonment counterclaim, awarding $100,000 in compensatory damages and finding him entitled to punitive damages on the same.  (Doc. 93.)  However, the jury found against Roberts on his assault counterclaim, and, as expressed in the

_____

[2] In his Answer, Roberts challenged the legitimacy of Adams' allegation of damages in excess of the statutory threshold.  However, he did not pursue the defense further.  (*Compare* Doc. 4 at 4 *with* Doc. 64 at 4.)

[3] Although Adams' Complaint charged "assault" as his first cause of action (Doc. 1 at 5–6), the Court construed the claim throughout litigation as one for battery based on Adams' allegations of injuries he sustained as a result of contact with Roberts (Doc. 22  at 1–2 n.1).  The Final Pretrial Order confirms Adams' assent to this construction.  (Doc. 64 at 3.)

verdict form, concluded that Adams failed to prove his battery, trespass, and intentional infliction of emotional distress claims by a preponderance of the evidence.  (*Id*.)  In the same form, to which neither party objected, the jury concluded that Roberts was justified in using force against Adams.  (*Id.* at 1.)

After the jury was polled on the verdict form and ordered to return to the jury room, the Court conferred with the parties on punitive damages.  Counsel for Adams and Roberts declined the Court's invitation to proffer any evidence on the issue, instead deciding to proceed directly to argument.  The jury returned, the parties argued, and the Court again excused the jury to deliberate.  After about 20 minutes, the jury returned with a verdict for $750,000 in punitive damages on Roberts' false imprisonment claim.  Three days after the jury was discharged, and pursuant to Federal Rule of Civil Procedure 58, the Court ordered entry of judgment in favor of Roberts on his false imprisonment claim, against him on the assault claim, and against Adams on all three of his tort claims.  (Docs. 97, 98.)  Then, as required by Montana statute, the Court reviewed and affirmed the jury's punitive damage award.  (Doc. 102.)

Now, Adams moves for judgment as a matter of law or a new trial, or, alternatively, an amended judgment as it relates to the Court's affirming the punitive damage award.  (Docs. 106, 114.)  In support of the latter, Adams files a

Declaration regarding his net worth.  (Doc. 106-1.)  Finally, Adams requests an extension of the automatic stay of execution of the judgment.

## DISCUSSION

Adams moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(b),[4] or a new trial pursuant to Rule 59(a), or an amended judgment pursuant to 59(e).  As discussed further below, different standards apply to each Rule Adams invokes, but the Constitution underpins them all.  It is worth remembering, in other words, that parties to suits in common law are guaranteed "the right of a trial by jury . . . and no fact tried by a jury, shall be otherwise reexamined in any court of the United States."  U.S. Const. amend. 7.  Thus, as it considers Adams' request to be relieved from the jury's two unanimous verdicts in this case, the Court bears in mind that constitutional principles disfavor granting the relief he seeks, at least to the extent he asks the Court to reevaluate facts properly found by the jury.  *See* 9B C. Wright & A. Miller, *Federal Practice and Procedure* § 2522, pp. 227–29 (3d ed. 2008) (discussing how Rule 50(b)'s

---

[4] After the defense rested on the fourth day of trial, counsel for Adams moved for judgment as a matter of law pursuant to Rule 50(a) on Roberts' counterclaims of false imprisonment and assault.  The Court denied the motion on the record, explaining its view that adequate evidence had been presented to allow both claims to go to the jury.  Thus, no dispute exists that Adams properly followed the procedural requirements to challenge the sufficiency of the evidence after the verdict and entry of judgment.  *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 399 (2006) (iterating the two stages required to challenge the sufficiency of the evidence in a civil jury trial, pursuant to Rule 50).

"renew[al]" qualification supplies the "fiction" necessary to avoid concern that entry of judgment contrary to the verdict violates the Seventh Amendment).

## I.    Judgment as a Matter of Law

As he did at the close of the defense's case at trial, Adams argues that the Court should grant judgment as a matter of law on Roberts' false imprisonment claim based on insufficient evidence.  And because the jury returned a punitive damage award based on the same purportedly unsupported claim, Adams adds that the Court should render judgment as a matter of law on the punitive damage award as well.

Rule 50 directs a court to render judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50 (a)(1).  Out of respect for the sanctity of the jury's verdict, a court must uphold the verdict if it is supported by "substantial evidence."  *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).  A court must review all the evidence in the record and draw "all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Importantly, because credibility and evidentiary weight are the jury's province, a court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 150–51. In other words, courts considering Rule 50 motions "should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is *uncontradicted and unimpeached*, at least to the extent that that evidence comes from disinterested witnesses." *Id.* at 151 (emphasis added).

Here, although Adams advances three arguments in support of judgment notwithstanding the verdict, all of them would require the Court to weigh the evidence, make credibility determinations, or reach absurd legal conclusions. The Court addresses each argument in turn.

### A. Whether Roberts had permission to use the Easement is irrelevant, but even if was relevant, sufficient evidence supports the jury's finding that Lance Melton granted him license to use it.

First, Adams says, "[t]here is no legally sufficient basis to conclude that Adams falsely imprisoned Roberts because Roberts did not have the right to use the easement road." (Doc. 106 at 3.) Specifically, Adams argues that the "unrefuted evidence" shows that Lance Melton revoked Roberts' license to use the Easement. (*Id.*) Because Roberts was not in a place of his "lawful choice," then, Adams concludes that he could not be unlawfully imprisoned there. *See Hughes v. Pullman*, 36 P.3d 339, 343 (Mont. 2001) ("The gravamen of a false imprisonment

- 8 -

claim is the deprivation of liberty of movement or freedom to remain in the place of one's lawful choice.").

There are several problems with this argument, both legally and factually. Starting with the former, Adams fails to acknowledge that Montana law—recited in the jury instruction to which he did not object—requires only two elements to prove false imprisonment, and the plaintiff being in a place of his "lawful choice" is not one.  "The two elements of false imprisonment are the restraint of an individual against his will and the unlawfulness of such restraint." *Hughes*, 36 P.3d at 343; *see also* Final Jury Instr. No. F-34.

Adams' argument misconstrues the second element by focusing on the conduct of the victim of false imprisonment, rather than the actions of the perpetrator of the tort.  That is, his construction would provide immunity from a false imprisonment claim if the plaintiff lacked permission to be in the place where the defendant restrained her.  It is not difficult to imagine scenarios that render Adams' interpretation absurd.  For example, a store clerk could lock a customer in a storage closet for a week but avoid false imprisonment liability if, at the time of the restraint, the customer was in the store after closing time without permission. Adams provides no authority to support this construction, and the Court's research finds none, either.

Instead, the Court is convinced that the second element of a false imprisonment claim focuses on the lawfulness of the *defendant's* conduct, not the plaintiff's purported wrongdoing at the time of the restraint.  On this point, and as the Court indicated to the parties in the middle of trial,[5] *Whitten v. Cox*[6] is illustrative. There, plaintiffs attempted to access their own land by driving across the defendant's property.  *Whitten*, 799 So.2d at 6.  When the defendant noticed them, he shot his pistol into the air before shooting out one of the tires of the plaintiffs' pickup.  *Id.*  After he ordered them from the truck, the defendant held the plaintiffs at gunpoint, handcuffed them, and took them back to his camp to call the local sheriff.  *Id.*  The plaintiffs sued the defendant for false imprisonment, and the defendant counterclaimed alleging trespass.  *Id.* at 5.  A jury found in favor of both parties on their respective claims, and the Mississippi Supreme Court affirmed the verdict.  *Id.* at 9, 19.

Notably, a false imprisonment claim under Mississippi law is comprised of the same elements as a claim brought pursuant to Montana law: "(1) detention of the plaintiff; and (2) that such a detention was unlawful."  *Compare id.* at 9 *with Hughes*, 36 P.3d at 343.  And, the *Whitten* Court explains, "the second element

---

[5] After the third trial day, and along with its proposed final jury instructions, the Court emailed counsel a copy of *Whitten v. Cox*, stating its view that the case appeared to address whether false imprisonment and trespass constitute mutually exclusive claims.  Adams did not raise the issue again until the instant posttrial motion.
[6] 799 So.2d 1 (Miss. 2000).

turns on whether, looking at the totality of the circumstances, the actions of the *defendant* were objectively reasonable in their nature, purpose, extent and duration." 799 So.2d at 9 (internal quotation marks and citation omitted) (emphasis added). In *Whitten*, then, it was the reasonableness of the defendant's actions in attempting to arrest the plaintiffs, not their trespass to his land, that controlled the jury's decision that he falsely imprisoned them. *Id.*

So too here. Whether Roberts was lawfully on the Easement is irrelevant to the question of whether Adams' restraint was lawful. To conclude otherwise would lead to absurd results, and Adams offers no authority to support reaching such a conclusion.

To be sure, a defense exists to the second element of a false imprisonment claim, but it doesn't apply in this case. *Mont. Pattern Jury Instr. Civ.* 9.10 (2d ed. 2003) (citing Mont. Code Ann. § 46-6-502). Under Montana's citizen's arrest statute, a private person may restrain another when "there is probable cause to believe that the person is committing or has committed an offense and the existing circumstances require the person's immediate arrest." Mont. Code Ann. § 46-6-502(1). But even then, the force used to detain the arrested person must be reasonable. *Id.*

The issue with applying the citizen's arrest defense here is that Adams' testified without qualification that he was *not* attempting to execute such an arrest

when he blocked Roberts' exit point from the Easement based on a belief that Roberts was committing a trespass—or any other offense, for that matter.  For that reason, the Court refused to give four proposed jury instructions on the defense. And, no support exists for the Court to make a post-trial legal determination that Roberts failed to prove the second element of his false imprisonment claim because Adams' restraint was lawful.

Moreover, even if Roberts' status relative to the Easement was relevant to proving his prima facie false imprisonment claim, the Court cannot agree that "unrefuted" trial evidence showed that Lance Melton revoked his license.  True, Lance Melton agreed that "in his mind," he temporarily revoked Roberts' license to use the Easement when he said, "Do not go."  But the jury also heard evidence that at the same time Lance Melton mentally revoked Roberts' license to use the Easement, he was sending an email to Adams informing him that Roberts and Lindsay Roberts had his permission to use it.  Additionally, Lance Melton testified about notes he took contemporaneous to or shortly after the altercation, which indicated that he told Roberts he could use the Easement.

Again, the Court must draw all reasonable inferences in Roberts' favor, and it need not give credence to contradicted evidence supporting Adams. *Reeves*, 530 U.S. at 151.  Under this standard, and setting aside the legal infirmities of Adams' legal argument on this point, the Court finds the jury had a sufficient evidentiary

- 12 -

basis to find that Lance Melton did not actually revoke Roberts' license to use the Easement, notwithstanding his contradictory testimony four years after the fact.

**B.    Sufficient evidence supports the jury's finding that Adams deliberately blocked Roberts' escape from the north end of the Easement.**

In his second argument for judgment as a matter of law, Adams contends that insufficient evidence supports the intent element of Roberts' false imprisonment claim.  Because he testified at trial that he was "dazed" following the altercation with Roberts, Adams insists that the "unrefuted" evidence showed that he did intend to park the four-wheeler in such a way that it blocked Roberts' escape.  (Doc. 106 at 4.)  In other words, Adams argues that his purported mental state precluded him from forming the intent required for the tort charged.

As an initial matter, the Court emphasizes that "intent" as an element of intentional torts, like false imprisonment, "denotes that the actor desires to cause the consequences of his act, *or that he believes that the consequences are substantially certain to result from it*."  Restatement (Second) of Torts § 8A (1965) (emphasis added); *Cf. Mont. Pattern Jury Instr. Civ.* 9.01, note (2d ed. 2003) ("These definitions are consistent with Restatement (Second) of Torts[.]").  Thus, even if the jury decided that Adams did not park the four-wheeler at the Easement's north end with the *purpose* to confine Roberts, it could have properly

found false imprisonment through evidence that Adams acted with the *substantial certainty* that Roberts would be trapped if he parked his four-wheeler where he did.

Bearing this definition of intent in mind, the Court concludes that judgment as a matter of law on this basis would be inappropriate.  Again, Adams' argument on this point revolves around his "unrefuted" testimony that he was "dazed" after he confronted Roberts on the Easement's south end.  However, Roberts proffered substantial evidence that whatever Adams' emotional state was, he was not "dazed."  For example, a photograph produced for the first time at trial showed Adams sitting comfortably in a chair in the middle of the Easement after the altercation, reviewing documents and chatting on his cell phone.  Moreover, Lance Melton testified that Adams took a phone call from him shortly after the incident but did not offer any indication that Adams sounded confused when instructed not to prevent Roberts from leaving.  Additionally, Adams testified that he parked the four-wheeler in such a way that it was blocking the north end of the Easement, and that he did not move it when Roberts requested him to do so.

In sum, in deciding whether Adams acted deliberately, the jury was presented evidence that could have led it in either direction on the question of whether Adams acted deliberately when he blocked the north end of the Easement. On one hand, it had Adams' own testimony about his mental state.  On the other hand, it had a photograph and a phone call that seem to indicate that Adams was

entirely lucid following his confrontation with Roberts.  The jury also had Adams'

admission that his four-wheeler blocked Roberts' escape, which he would not or

could not move out of the way.  That the jury apparently viewed the evidence

favorable to Adams as carrying less weight or lacking credibility is an issue outside

this Court's province.  *Reeves*, 530 U.S. at 150.

Because the Court finds that a legally sufficient basis supports the jury's

conclusion that Adams' intentionally blocked the north end of the Easement with

his four-wheeler, the Court need not address Adams' secondary argument about

who later moved the four-wheeler to the Easement's south end.  (*See* Doc. 106 at

4.)

### C.     No evidence was presented that Roberts was aware of a means of escape.

Adams next argues that insufficient evidence supports the jury's

determination that he confined or restrained Roberts, because Roberts had a means

of escape.  (Doc. 106 at 4–5.)  Specifically, Adams points to Lance Melton's

testimony regarding the existence of another road that apparently provides

alternative access to the county road.  (*Id.* at 5.)  Though Adams does not explicitly

say so, the Court understands his argument to hinge on the following principle of

the tort of false imprisonment:

> If the actor knows of an avenue of escape, he cannot intend to imprison
> the other by closing all the other exits unless he believes that the other
> is unaware of the available avenue of escape. . . . [I]t is unreasonable

> for one whom the actor intends to imprison to refuse to utilize a means of escape of which he is himself aware merely because it entails a slight inconvenience or requires him to commit a technical invasion of another's possessory interest in land or chattels which subjects him at most to the risk of an action for nominal damages which in practice is seldom if ever brought.

Restatement (Second) of Torts § 36, cmt. a (1965).

The problem with this argument is that no evidence was presented to the jury that Lance Melton informed Roberts of the alternate route through Happy Trails Lane.  Instead, Lance Melton testified that he did not recall telling Roberts anything about the Happy Trails Lane route, but that it would not surprise him if he had.  Neither Adams nor Roberts pursued the issue beyond this testimony, which was at best a verbal shrug.[7]  The Court will not overturn the jury's verdict where no evidence established that Roberts knew about a purported means of escape from his wrongful confinement.  A person must be aware of the escape route to relieve his would-be captor of liability for false imprisonment.  Restatement (Second) of Torts § 36, cmt. a. So, while Adams contends that insufficient evidence supports false imprisonment on the basis of an escape route, the Court reiterates that no

---

[7] Adams failed to raise this "means of escape" defense in his pretrial briefing, nor was it telegraphed in his proposed jury instructions or argued to the jury during closing arguments. Most importantly, this defense did not form the basis of Adams' Rule 50(a) motion.  Ordinarily, this failure would result in a waiver of the argument now.  *OTR Wheel Engr., Inc. v. W. Worldwide Services, Inc.*, 897 F.3d 1008, 1016 (9th Cir. 2018) ("[F]ailing to make a Rule 50(a) motion before the case is submitted to the jury forecloses the possibility of considering a Rule 50(b) motion.").  However, because Roberts did not object to Adams' argument on the basis of waiver, any waiver defense is waived.  *Id.*  Thus, the Court considers the argument on the merits.

evidence was presented to the jury that Roberts knew about the Happy Trails Lane alternative when Adams blocked the north end of the Easement.

Adams also suggests that the false imprisonment claim should fail as a matter of law because Roberts "willfully stayed" at the south end of the Easement "so that he could tell law enforcement his side of the story." (Doc. 106 at 5.) However, Roberts testified that he stayed on the premises to wait for the authorities because he "couldn't get out." Again, by asking the Court to render judgment as a matter of law on this basis, Adams is asking it to weigh contradictory evidence and make credibility determinations, which it cannot do. *See Reeves*, 530 U.S. at 151.

## D.   The evidence supports a punitive damage award.

Finally, Adams argues that even if the Court denies his request for judgment as a matter of law on the false imprisonment claim, it should find that an award of punitive damages is not supported by clear and convincing evidence. (Doc. 105 at 5.) Adams points to the arguments already considered here, urging that even if Roberts may have proved his false imprisonment claim by a preponderance of the evidence, "serious doubt" remains as to whether Adams intentionally restrained him. (*Id.* at 6.) The Court disagrees.

Following the close of evidence at trial, the Court gave the jury three instructions on punitive damages. *See* Final Jury Instrs. No. F-38–40. Each instruction tracked the language of Montana's pattern instructions, and neither

- 17 -

party objected to them.  Of particular relevance to Adams's instant argument, Final
Instruction F-39 stated the following: "The plaintiff must prove all the elements of
their respective claims for punitive damages by clear and convincing evidence.
'Clear and convincing' means evidence in which there is no serious or substantial
doubt about the conclusions drawn from the evidence."

At bottom, Adams argues that the evidence he proffered in his favor is
sufficient to establish "serious doubt" about the false imprisonment claim.  (Doc.
106 at 5–6.)  This is simply not the standard.  As analyzed above, Roberts
presented substantial evidence to support his theory of the case and adeptly
impeached a broad swath of the evidence elicited by Adams.  That the jury chose
to believe Roberts' version over Adams' about what happened on the Easement on
July 12, 2017 does not call into "serious or substantial doubt" the propriety of the
punitive damage determination.  If the mere existence of disputed facts was enough
to defeat a punitive damage claim, then punitive damages would rarely be
awarded.

Accordingly, the Court denies Adams' Rule 50 motion on the issue of
punitive damages.  As discussed already, it was reasonable for the jury to find that
Roberts proved his false imprisonment claim by a clear and convincing standard.

## II.   New Trial

Rule 59 "recognizes the common-law principle that is the duty of a judge who is not satisfied with the verdict of a jury to set the verdict aside and grant a new trial." 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2801, p. 52 (3d ed. 2012). Accordingly, after a jury trial, a court may grant a motion for a new trial on all or some of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). Reasons warranting a new trial include a determination that "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) (citation omitted). Additionally, and falling within the broad scope of permissible grounds for a new trial, a finding of excessive damages may warrant relief under Rule 59. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). A district court may not, however, "grant or deny a new trial merely because it would have arrived at a different verdict." *Id.*

Notably, and unlike its consideration of a motion for judgment as a matter of law, a court considering a motion for a new trial "can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Const. Co., Inc. v.*

*Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). Nevertheless, "a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of its own doubts in the matter." *Id.* (citation omitted). On balance, a judge should only grant a new trial if after "having given full respect to the jury's findings, [he] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.*

Here, Adams moves for a new trial as an alternative to his request for judgment as a matter of law. He urges that even if judgment as a matter of law is unwarranted, the Court should order a new trial due to: (1) an inconsistent verdict; (2) insufficient evidence on the false imprisonment claim; and (3) excessive damages. (Doc. 106 at 6–10.) Taking each argument in turn, the Court denies Adams' motion for a new trial.

### A.   Any argument that the jury returned an inconsistent verdict has been waived.

Adams argues first that the jury's answers on the verdict form[8] are "logically inconsistent" as it relates to the alleged battery and the justifiable use of

---

[8] The verdict form completed by the jury in this case is styled "Special Verdict Form." (Doc. 93.) However, the form is more appropriately characterized as one seeking *general* verdicts on multiple claims. Unlike a special verdict, which is "in the form of a special written finding upon each issue of fact," general verdicts "do not involve factual findings but rather ultimate legal conclusions." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1031 (9th Cir. 2003). Thus, "in a general verdict[,] the jury announces only the prevailing party on a particular claim, and may announce damages." *Id.* Such is the case here. That is, the jury was not "compel[led] . . . to

force defense.  (Doc. 93 at 1–2.)  Specifically, he contends that an irreconcilable

conflict exists between the jury's finding "both that Roberts justifiably used force

and did not commit a battery."  (Doc. 106 at 8.)  Instead, Adams says, "the jury

should have found that Roberts *did* commit a battery, but that Adams was not

entitled to any damages" if it decided that Roberts' use of force was justified.  (*Id.*

(emphasis added.)

However, even if the jury's general verdicts on battery and justified force

irreconcilably conflict,[9] Adams waived this argument as a basis for posttrial relief.

A party "waive[s] its objection to the jury's verdict . . . by not objecting to the

alleged inconsistency prior to the dismissal of the jury."  *Williams v. Gaye*, 895

F.3d 1106, 1130 (9th Cir. 2018) (citation omitted) (alteration in original).  Adams

---

focus exclusively on its fact finding role"; instead, the jury's determinations required legal
instruction so it could apply fact to law.  *Id.*  Thus, though the verdict form in this case is entitled
"Special Verdict Form," the Court construes it as a form seeking general verdicts.  *See Jarvis v.
Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002) ("[W]here a jury is instructed to apply legal
principles and assign liability, 'the answers to the questions submitted to the jury are not special
verdicts, despite those words in the title appended to the form[.]'").

[9] Even if Adams had not waived this argument, the Court would be hard-pressed to grant a new
trial based on the inconsistency alleged.  Indeed, the Court "retains the authority, even in a civil
case, to allow an apparently inconsistent verdict to stand."  *City of Los Angeles v. Heller*, 475
U.S. 796, 806 (1986) (Stevens, J., dissenting).  Moreover, the Seventh Amendment compels
courts "to attempt to read the verdict in a manner that will resolve inconsistencies."  *Id.*  Here,
notwithstanding Adams' contrary implication, it is not "too difficult to speculate as to how the
jury arrived at its conclusions" on battery and justified force.  (*See* Doc. 106 at 8.)  The jury
heard evidence, which it apparently believed, that the contact Roberts made with Adams' body
was as a result of Adams skidding up to him on the four-wheeler.  Roberts testified that he stuck
his arm out to block Adams from pinning him against his truck.  From this testimony, it is not
unreasonable for the jury to have decided that any contact Roberts made with Adams' body was
both unintentional and justified.

did not object to the jury's verdicts prior to the discharge of the jury, nor did he object during a short colloquy with the Court after the jury was discharged.

Thus, Adams waived his challenge to any perceived inconsistencies between the jury's general verdicts on battery and justified force, and a new trial on this basis is denied.

### B.      The jury's false imprisonment determination is not against the clear weight of the evidence.

Adams next argues that a new trial should be ordered based on the same sufficiency of the evidence arguments he advanced in support of judgment as a matter of law, emphasizing that Rule 59 allows the Court greater flexibility than Rule 50.  (Doc. 106 at 8.)  The Court understands that the standard for granting a new trial is, perhaps, "less strict" than that for granting judgment as a matter of law.  *Landes Const. Co., Inc.*, 833 F.2d at 1371.

In this case, however, the Court is convinced—for the same reasons it denies Rule 50 relief—that the jury's verdict is supported by the weight of the evidence. That Adams presented a story to the jury that conflicted with Roberts' version of events does not mean the jury got it wrong by believing Roberts.  Even if the Court harbors doubts about them, which it doesn't, "a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system," would direct it to accept the jury's findings.  *Id.* (citation omitted).

- 22 -

In sum, after sitting through the entire trial and considering all the evidence, the Court is not left with "the definite and firm conviction" that the jury committed a mistake.  *See id.*  Thus, a new trial on based on the weight of the evidence is denied.

## C.    The jury's damage awards are not excessive.

Finally, Adams argues that a new trial is warranted because the jury's compensatory and punitive damage awards reflect that they were "given under the influence of passion or prejudice."  (Doc. 106 at 9–10.)  Although Adams gives the issue of excessive damages in the context of his new trial motion limited analytical breath (*see id.*), the Court will endeavor to explain its denial of his new trial motion on this basis without the benefit of any meaningful argument.

As the name suggests, compensatory damages are meant to compensate: that is, "to place [the injured] in a position substantially equivalent in a pecuniary way to that which he would have occupied had no tort been committed."  *Estate of Cote*, 433 P.3d 221, 227 (Mont. 2019) (citations omitted).[10]  While a judgment for compensatory damages must be supported by substantial evidence, a "defendant

---

[10] Adams filed this case in federal court pursuant to its diversity jurisdiction.  28 U.S.C. § 1332. Accordingly, the Court applies Montana law to its consideration of the jury's damage awards. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 434 (1996) (quoting *Browning-Ferris Inds. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 279 (1989) ("[T]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered.").

should not escape liability because the amount of damages cannot be proven with precision." *Johnson v. Murray*, 656 P.2d 170, 177 (Mont. 1982).  Indeed, "[t]he law does not require that any witness should have expressed an opinion as to the amount of damages that would compensate for humiliation, distress, or embarrassment." *Id.*  Instead, "[t]he law requires only that the trier of fact exercise calm and reasonable judgment, and the amount of award rests of necessity in the sound discretion of the trier of fact." *Id.*  The "proper measure of compensatory damages must be determined solely based on the facts of each case." *Estate of Cote*, 433 P.3d at 227.

 In addition to compensatory damages, punitive damages may be awarded "for the sake of example and for the purpose of punishing the defendant."  Mont. Code Ann. § 27-1-220(1).  Thus, in contrast to compensatory damages' aim to make the injured party whole, "punitive damages serve a broader function; they are aimed at deterrence and retribution." *Estate of Cote*, 433 P.3d at 227 (quoting *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).  To sustain an award of punitive damages, "there must be substantial evidence in the record of . . . fraud or malice, actual or presumed, toward the plaintiff[.]" *Johnson*, 656 P.2d at 175.

Considering the jury's compensatory and punitive damage awards in this case, by reference to federal standards developed under Rule 59, the Court is not

persuaded that they fall outside the confines set by state law such that a new trial or remittitur should be ordered.  *See Browning-Ferris Inds. of Vt., Inc.*, 492 U.S. at 792.  Taking the $100,000 compensatory damage award first, the Court is not left with the definite and firm conviction that the jury made a mistake.  To be sure, Adams' restraint of Roberts did not last days, or even hours.  However, the jury heard evidence that Roberts was trapped for a duration long enough for multiple phone calls, including one to 911, to be made and received.  That Adams would not value the amount of time Roberts spent restrained at $100,000, or that Roberts did not offer any evidence of physical or economic injury is irrelevant.  Roberts and his daughter testified to the distress he suffered as result of Adams' conduct. He was not required to prove the pecuniary amount of distress with precision. *Johnson v. Murray*, 656 P.2d at 177.

Moreover, and as Roberts points out, Adams' argument on this issue rings disingenuous, when Adams himself argued for $300,000 to compensate him for the alleged "beating" that the jury determined did not occur.  Why $300,000 would be reasonable compensation for Adams' alleged injuries, but $100,000 is unreasonable for the damages Roberts properly proved is unclear.  In any event, the jury's compensatory damage award falls within the confines of Montana law, and it does not warrant remittitur or a new trial under Rule 59.

Turning to the punitive damage award, the Court is convinced that the jury based its punitive damage verdict and award not on passion and prejudice as Adams suggests, but instead to make an example and punish him for his malicious conduct.  *See* Mont. Code Ann. § 27-1-220(1).  Roberts presented substantial evidence that Adams acted maliciously and intentionally by instigating a violent confrontation in a vigilante-style effort to prevent Roberts from using an Easement that he had license to use.

The jury heard that Adams followed Roberts down the Easement on his four-wheeler, coming to a stop in front of Roberts in such a way that Roberts believed he would be pinned between his truck and the four-wheeler.  The jury then heard that Adams drove back to the Easement's exit to the county road and used the four-wheeler to intentionally block Roberts' escape.  When Roberts retreated to the south end of the Easement, someone moved the four-wheeler so that it blocked Roberts' immediate escape from that end, too.  The jury saw photos and video of Adams sitting comfortably in a lawn chair in the middle of the Easement while his family screamed at Roberts.

In sum, substantial evidence of Adams' malice toward Roberts exists in the record.  The weight of the evidence supports the jury's determination that punitive damages are appropriate in this case, on the facts presented, the Court cannot conclude that $750,000 is an unreasonable amount.

Thus, the Court denies Adams' motion for a new trial or remittitur on an excessive-damages basis.

## III.   Amended Judgment

Finally, if the Court denies posttrial relief in the form of judgment as a matter of law or new trial, Adams asks the Court to amend the judgment pursuant to Rule 59(e).  This request is denied.

In addition to relief in the form of a new trial, Rule 59 also authorizes a motion to "alter or amend" a judgment.  However, relief under Rule 59(e) is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources."  *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (citation omitted).  Indeed, a district court generally should not grant a Rule 59(e) motion in the absence of "newly discovered evidence, clear error, or an intervening change in the controlling law."  *Wells Fargo Bank, N.A. v. Mahogany Meadows Ave. Trust*, 979 F.3d 1209, 1218 (9th Cir. 2020) (citation and internal quotation marks omitted.).  Rule 59(e) may not be used as a vehicle "to raise arguments or present evidence for the first time when they reasonably could have been raised earlier."  *Id.* (quoting *Kona Enters., Inc.*, 229 F.3d at 890).

Here, Adams seeks the "extraordinary remedy" of Rule 59(e) relief for many of the same reasons already addressed in this Order and previous orders.  First, he

asks the Court to reduce or vacate the judgment as it relates to compensatory damages.  (Doc. 106 at 10–12.)  However, nothing about his argument on this point relates to "newly discovered evidence, clear error, or an intervening change in controlling law."  *See Wells Fargo Bank, N.A*, 979 F.3d at 1218.  The Court declines to create an exception to the general rule for granting Rule 59(e) relief when it does not find, as addressed *supra*, that the compensatory damage award in this case is unreasonable.

Second, Adams asks the Court to reduce the punitive damages award pursuant to Montana's statutory cap.  (Doc. 106 at 12–13.)  Under Montana law, "[a]n award for punitive damages may not exceed $10 million or 3% of a defendant's net worth, whichever is less."  Mont. Code Ann. § 27-1-220(3).  The problem with this argument, as already addressed by the Court's order affirming the jury's punitive damage award (Doc. 102), is that Adams failed to provide the jury with any evidence of his net worth.  And, "[a] defendant who offers no evidence of net worth waives any claim that the statutory limit should be applied." *Harrell v. Farmers Ed. Co-op Union of Am., Mont. Div.*, 314 P.3d 920, 939 (Mont. 2013) (citing *Blue Ridge Homes, Inc. v. Thein*, 191 P.3d 374 (Mont. 2008)).  Now, citing *Harrell*, Adams asks the Court to consider a posttrial Declaration of his net worth, and apply the statutory cap accordingly.  (Doc. 106-1.)

To be sure, as Adams notes, it is the Court, not the jury, that applies the statutory limit to a punitive damage verdict. *Harrell*, 314 P.3d at 940. But *Harrell* does not stand for the proposition that a court can apply the limit in an evidentiary void. Instead, the *Harrell* defendant *did* present evidence of its net worth during the punitive damages phase of the trial. *See Harrell*, 314 P.3d at 939 ("Both parties referenced this financial statement [reflecting the defendant's net worth] during the punitive damages phase. . . . The jury took the statement into the jury room during its deliberation on punitive damages."). The narrow question in *Harrell* was whether the trial court should have allowed the defendant to submit "more current evidence of its net worth" after the jury's punitive damages verdict. *Id.* at 940. The Supreme Court decided that, because the posttrial update would not allow the defendant to "gain an advantage," the trial court should have accepted it and applied the statutory cap to the update. *Id.*

Here, however, Adams never submitted reliable financial information at any stage of the proceedings. *He declined the Court's explicit invitation to present evidence of his net worth to the jury at the punitive damage phase.* Moreover, he now submits a self-prepared document that cannot be characterized as "reliable" in any sense of the word. *See Thein*, 191 P.3d at 143 ("[T]he defendant must provide the court with a truthful and reliable basis to limit the punitive damage award.").

- 29 -

Specifically, Adams includes the total judgment amount *in this case* as one of his liabilities.  (Doc. 106-1 at 8.)

Adams' willingness to engage in sleight of hand to the tune of $850,000 calls into doubt the remainder of his assertions in his financial Declaration.  Thus, because Adams has offered no *reliable* evidence of his net worth in this case— before or after trial—he waives any claim that the statutory limit should be applied.  Accordingly, the Court denies Rule 59(e) relief on this basis.

Adams next asks the Court to revisit its Order affirming the punitive damage award.  (*See* Doc. 102.)  There, the Court analyzed the factors under Montana Code Annotated § 27-1-221(b) and determined that the jury's $750,000 award should stand.  While the Court appreciates Adams' perspective as to how each factor should be weighed (Doc. 106 at 13–22), none of his arguments persuade the Court that it erroneously made factual findings and legal conclusions that justify Rule 59(e) relief.

Finally, Adams argues that the Court should use Rule 59(e) as a mechanism to reduce the punitive damage award pursuant to federal due process guideposts.  (Doc. 106 at 22–26.)  Citing the Supreme Court's seminal decision in *BMW of North America, Inc. v. Gore*,[11] Adams contends that the reprehensibility of his conduct, the disparity between the harm suffered and the punitive award, and the

---

[11] 517 U.S. 559 (1996).

difference between the instant award and comparable awards weigh in favor of either reducing the award or setting it aside.  (*Id.* at 23.)  The Court disagrees.

"[T]he most important indicum of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (quoting *Gore*, 517 U.S. at 575).  To determine the reprehensibility of the conduct at issue, courts must consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.*  While the presence of any one factor may not be enough to sustain a punitive damage award, "the absence of all of them renders any award suspect."  *Id.*

Here, notwithstanding Adams' largely self-serving and conclusory analysis (Doc. 106 at 23–24), the Court finds that many of the reprehensibility factors weigh in favor of leaving the punitive damage award intact.  Adams physically barred Roberts from leaving the Easement.  The evidence showed, and the jury found, that Adams' conduct was intentional and that he acted indifferently to the harm his false imprisonment caused Roberts.  On this point, the photograph of Adams sitting comfortably in the middle of the Easement while Roberts remained trapped is particularly striking.  Indeed, as Adams notes, no evidence of Roberts'

financial vulnerability was presented, and the incident at issue was isolated, not repeated.  Thus, two factors weigh against letting the award stand.  However, the final factor favors affirming the award.  Again, the jury found Adams' conduct to be both intentional and malicious.  The Court finds that three of the five reprehensibility factors weigh in favor of letting the jury's punitive damage award stand.

On the second *Gore* guidepost, the Court does not find an unconstitutional disparity between actual harm and the punitive damage award.  *See Campbell*, 538 U.S. at 418.  The Supreme Court has repeated its reluctance to establish a bright-line due process ratio, but has stated "what should be obvious: Single digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios of 500 to 1." *Id.* at 425.  Ratios aside, "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.*

At the outset, the Court notes that multiplier at issue is single-digit; specifically, the ratio is 7.5 to 1—well outside the realm of 500 to 1.  Next, and as previously discussed, Adams' argument about the excessiveness of the compensatory award and the punitive damage award seem disingenuous when viewed in context.  Adams argued for $300,000 in compensatory damages in a case

revolving around an altercation that he now says was nothing more than a 25-minute inconvenience.  In addition to asking for more than a quarter million dollars in actual damages, Adams—like Roberts—sought punitive damages.  In other words, had the jury found for Adams and awarded him his requested damages, the total award would likely not be too far from $850,000.

Most importantly, after sitting through the five-day trial in this case, the Court finds that the facts and circumstances of Adams' conduct and the harm to Roberts justify the $750,000 punitive damage award.  Adams acted intentionally, maliciously, and dangerously in a misguided effort to vindicate his perceived property rights.  The jury found that Roberts suffered actual harm in the amount of $100,000 because of Adams actions.  A punitive damage award less than eight times than amount is not unreasonable; it vindicates the State's interests in deterrence while satisfying due process.  In sum, the Court finds the second *Gore* factor weighs in favor of affirming the punitive damage award.

Finally, while the Court agrees that the question is closer on the third *Gore* guidepost, it will not vacate the jury's award on this basis alone.  Again, the third *Gore* consideration "is the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases."  *Campbell*, 538 U.S. at 428 (citation and internal quotation marks omitted).  Because Adams uses false imprisonment's criminal analogue as a point of comparison, the Court will do the

- 33 -

same.  (Doc. 106 at 26.)  However, the Court is careful to note its awareness that "[p]unitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award."  *Campbell*, 538 U.S. at 428.

As Adams notes, the applicable criminal fine for unlawful restraint is $500. Mont. Code Ann. § 45-5-301(2).  He contends that the marginal criminal monetary sanction renders the punitive damage award in this case excessive.  (Doc. 106 at 26.)  While the Court agrees that $750,000 dwarfs the $500 fine, the jury in this case determined that Adams acted maliciously—a finding unnecessary to convict a person for criminal unlawful restraint.  Thus, the facts and circumstances in this civil case evidence conduct more culpable than contemplated by the criminal statute.  Still, Adams argument on this issue is well-taken, and the Court largely agrees that the third *Gore* factor, standing alone, probably weighs in favor of reducing the punitive damage award.

Be that as it may, the two other *Gore* guideposts direct the Court to leave the punitive damage award in place.  *See Campbell*, 538 U.S. at 419 ("[T]he most important indicum of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.").  On appeal, a panel of judges who did not hear the evidence as it was presented and argued at trial, may very well weigh the *Gore* factors differently than the trial judge.  Nevertheless, having

- 34 -

adjudicated this case from its inception and after sitting through a five-day trial with an attentive and thoughtful jury, the Court is confident that this award satisfies due process and vindicates the State's interest in deterrence and retribution.

### ORDER

For the foregoing reasons, IT IS ORDERED that Adams' Motion for Relief under Rules 50 & 59 (Doc. 105) is DENIED.

IT IS FURTHER ORDERED that Adams' Motion to Extend Automatic Stay (Doc. 105) is DENIED as moot.

DATED this 11th day of August, 2021.

Dana L. Christensen, District Judge
United States District Court